RYAN C. NERNEY (CBN 297373)
TULLY RINCKEY PLLC
999 CORPORATE DRIVE, SUITE 100
LADERA RANCH, CA 92694

Phone: (619) 357-7600
Fax: (619) 357-7616
rnerney@fedattorney.com

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| **TATE NAN,** | ) | **Case No.** __'25CV1798 JLS  MSB__ |
| **Plaintiff,** | ) | |
| **v.** | ) | **COMPLAINT** |
| **SHIELD AI, INC.,** | ) | |
| **Defendant,** | ) | **Demand for Jury Trial** |
| | ) | |

The Plaintiff, Mr. Tate Nan, by and through his attorneys, Tully Rinckey PLLC, as and for his complaint against the Defendant, Shield AI, Inc., alleges the following:

## INTRODUCTION

1. This action is based on a wrongful, retaliatory discharge in violation of the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA), 38 U.S.C. §§ 4301-4335.  USERRA forbids employers to deny "retention in employment, promotion, or any benefit of employment" to an

1

employee based on that employee's military service, to include service in the Reserve components.  38 U.S.C. § 4311(a).  If the employee's military service, or his assertion of his USERRA rights, "is a motivating factor in the employer's action" in denying benefits or taking adverse action, the employer has violated USERRA.  38 U.S.C. § 4311(c).

2. This action is also based on an employer's failure to make "reasonable efforts" to qualify a returning employee for the position he held at the time of his departure for military service, as required by 38 U.S.C. § 4313(a)(1)(B) and 20 C.F.R. § 1002.196 to 197 (Dec. 19, 2005), a failure that was causally related to the employee's discharge.

3. This action is also based on an employer's retaliation against an employee who raised concerns about a possible violation of federal law to the employer's ethics officer, in violation of both federal and state whistleblower protection laws: 10 U.S.C. § 4701; Cal. Lab. Code § 1102.5.  Mr. Nan has exhausted administrative remedies for the federal whistleblower statute, and is not required to do so for the California statute.

4. Mr. Nan worked for Shield AI, Inc. ("The Company") from January 3, 2022, to July 16, 2024.  He received excellent performance reviews as well as promotions and bonuses throughout his time with the Company.  His performance was never at issue until it was later used as an excuse for firing him.

5. In December 2023, while Mr. Nan was absent performing military duty, the Company instructed him to sign forms related to his security clearance and security training, and to backdate the forms to February 22, 2022.  The Company, but not Mr. Nan, intended to use these backdated forms to deceive the Department of Defense during an upcoming audit.  If this deception was knowing, willful, and material, it violated 18 U.S.C. § 1001; but any actual violation of the latter statute is not a key issue in this case.

2

6. In May 2024, while Mr. Nan was absent performing military duty, the Company changed its policy with respect to admitting foreign guests onto Company premises. When he returned, the Company failed to inform him of the changed policy (i.e., to train him appropriately for the position he was returning to), then held it against him when he failed to adhere to the new policy. Other employees who were with Mr. Nan at the time (and just as responsible for following the policy) were not disciplined; only Mr. Nan was disciplined and terminated.

7. Mr. Nan informed the Company of his concerns about the possible violation of his USERRA rights. Mr. Nan also informed a Company ethics officer of his concerns about the backdated forms. Shortly after he raised these concerns, the Company fired him, falsely claiming that his termination was based on "performance."

## JURISDICTION AND VENUE

8. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331. Mr. Nan's claims arise under federal statutes, specifically USERRA and 10 U.S.C. § 4701, and under federal regulations interpreting and implementing USERRA.

9. This Court is an appropriate venue under 28 U.S.C. § 1391. The defendant has its headquarters in San Diego, California.

## PARTIES

10. The plaintiff, Mr. Tate Nan, is a U.S. citizen who resides in the state of New York.

11. The defendant, Shield AI Inc., is a Defense technology company that, amongst other things, develops artificial intelligence for manned and unmanned military aircraft. Its principal place of business is in San Diego, California. On information and belief, its current valuation is $5.3 billion.

3

12. The following Company employees play significant roles in the facts below:

    a. Mr. Brandon Tseng, co-founder of the Company.

    b. Mr. Alan Chirls, Vice President, Business Development and Mr. Nan's supervisor

    c. Ms. Renee Connor, Facility Security Officer for Crystal City, Virginia (close to the Pentagon)

    d. Mr. Ian Carlson, Head of Global Security

    e. Mr. James Carlson, chief legal officer and ethics officer for the Company

    f. Henoch Senbetta, Chief People Officer

## STATEMENT OF FACTS

13. Mr. Nan joined the U.S. Air Force Reserve in 2015.  He trained and qualified as a pilot, and spent over 4 years on active duty, with deployments to the Middle East.

14. Before coming to work for Shield AI, Mr. Nan also spent over 3 years working for technology companies that dealt with the Department of Defense.

15. Between his military service and his experience working with DOD vendors and contractors, Mr. Nan gained a strong understanding of the operational needs of the Department of Defense, the Defense technology industry, and the U.S. military's processes for acquiring and adopting technology.  He was a perfect fit for the Company, which is a DOD contractor and vendor.

## Mr. Nan Joins the Company.

16. On December 6, 2021, Mr. Nan accepted a position with the Company as a Senior Business Development Account Executive, with an annual salary of

$160,000, and an equity of 17,000 Initial Stock Options (explained below). His total pay and benefits for 2022 exceeded $184,000.

17. During 2022, Mr. Nan's work performance was very strong, as shown by his mid-year and year end performance reviews. His supervisor, Mr. Alan Chirls, described him as a "sales leader on the team," said that he "demonstrated incredible work ethic and grit while working around the clock to push existing deals forward, and generate new business," and described him as a "critical contributor to the success of our organization."

18. Mr. Nan's work performance continued strong in 2023. In his mid-year and year end reviews, Mr. Chirls described his performance as "very strong," said that he was "continually considered a subject matter expert," and that he "consistently drives outstanding outcomes."

19. On March 12, 2023, Mr. Nan was promoted to Senior Manager, Business Development Accounts, and was able to hire two additional subordinates who reported directly to him. The Company classified his promotion as a Merit Increase based on his excellent work performance, and the promotion came outside of the usual promotion cycle for the Company.

20. With his increased pay, additional equity, benefits, and the annual bonus he earned, Mr. Nan's pay and benefits for 2023 exceeded $344,000. He afterwards also received a commission based on his performance.

21. On February 25, 2024, Mr. Nan received a further compensation increase based on merit. If he had remained with the company, his compensation for 2024 would likely have exceeded $387,000.

**Mr. Nan is activated for extensive Reserve service.**

5

22. Normally, a Reservist is expected to mobilize for two days per month plus two weeks of annual training per year; but a Reservist can be activated for any amount of time in accordance with the needs of the Government.

23. Between December 2022 and mid-August 2023, Mr. Nan performed about 41 days of reserve service, always making sure to inform Mr. Chirls in advance. The Company gave him no trouble over this.

24. On August 11, 2023, Mr. Nan informed Mr. Brandon Tseng and Mr. Alan Chirls that he would be mobilized for at least 38 days, and probably for several additional months, in support of Operation Atlantic Resolve.

25. As Mr. Nan expected, the government did extend his orders and he was mobilized through March 27, 2024.

## Mr. Nan continues to perform Company duties while activated.

26. Mr. Nan continued to do work for the Company while he was mobilized, but only when his Company work would not interfere with his miliary duties.

27. When time permitted, Mr. Nan continued to supervise his subordinates remotely, to call potential customers, to speak with Mr. Chirls on a regular basis, and sometimes to introduce Company officials to persons he knew.  (Mr. Nan was paid for this work and is not claiming a loss of benefits based on it, only illustrating the value he continued to provide the Company even while mobilized.)

28. For example, on approximately October 13, 2023, Mr. Nan was asked to introduce Brandon Tseng, co-founder of the Company, to an executive of an aerospace firm with which the Company was considering doing business.  Mr. Nan made the introduction.

29. On 12 February 2024, Mr. Chirls informed Mr. Nan that he was receiving a bonus based on the performance of his team, adding the comment, "obviously no penalties as you are considered working when out" (i.e., the Company understood that he was not to be penalized for his military service).

30. On approximately March 14, 2024, Mr. Nan worked out a deal with a customer that wished to purchase drones from the Company.  This last deal was worth approximately $6 million, and Mr. Nan and his team closed it about the time Mr. Nan returned from military duty.

31. In early July 2024 Mr. Nan's team closed a sizable contract with the Department of Homeland Security, making the Company the prime contractor for a contract worth over 100 million USD.

**The Backdated Forms.**

32. Mr. Nan's duties with the Company included accessing and reviewing classified information.

33. Under 32 C.F.R. § 2001.80(d)(2) (Mar. 29, 2022), any individual who is to access classified information must first execute Standard Form (SF) 312, an agreement showing that he understands his obligations not to reveal classified information to unauthorized persons.

34. When Mr. Nan joined the Company, he had already executed SF 312 with the military.  The Company did not ask him to execute another SF 312 at that time.

35. On December 1, 2023, while Mr. Nan was on military duty, Ms. Renee Connor, one of the Company's Facility Security Officers, sent Mr. Nan a message marked as "important." In this message she asked him to sign documents, including a new SF 312 and an acknowledgment of having received an Initial Security Briefing from the Company.  (Mr. Nan did not remember having received this briefing or signing a SF 312 after joining the Company, but Ms.

Connor provided him with PowerPoint slides on the subject together with the forms to be signed in her message of December 1, 2023)

36. Between December 1, 2023 and December 11, 2023, Ms. Connor sent Mr. Nan five messages marked as "important" requesting him to complete the forms.

37. Of significance to this action, Ms. Connor asked Mr. Nan to backdate his signatures to February 22, 2022, i.e., about 22 months before he was actually signing them.  Ms. Connor said the backdated forms were necessary because of an upcoming audit by the Defense Counterintelligence and Security Agency (DCSA), a Government agency that supervises contractors to ensure they are complying with DOD security requirements.

38. At the time, Mr. Nan was extremely busy with his full-time military duty and his part-time work for the Company.  He did not see anything wrong with backdating the forms, particularly as he had already signed another SF 312 with the military.  He signed and backdated the forms as instructed.  Only later, as shown below, did he begin to have doubts about this action.

**Mr. Nan returns from active service.**

39. Mr. Nan's military orders ended on March 27, 2024, and he went straight back to work the next day. Mr. Chirls complimented Mr. Nan's performance and that of his subordinates in the context of the $6 million deal, saying, "You are all grinding!"

40. Between his return and his last day of work on July 16, Mr. Nan had to perform another 20 days of military duty.  Nonetheless, he was able to accomplish important work for the Company.

41. For example, Mr. Nan was selected to accompany Mr. Tseng to a business conference and assist in a presentation to Australian defense companies on May 6, 2024.  On June 19, 2024, Mr. Nan was able to resolve a serious issue

involving a potential customer, enabling discussions to continue on the sale of between $3 million and $5 million worth of new equipment. On July 9, 2024, a week before his last day, Mr. Nan was able to close a deal to provide over $107,000 in drone system training.

42. Between March 28 and July 16, 2024, no one suggested that Mr. Nan's work performance was anything less than exemplary.

**The "security incidents" that preceded Mr. Nan's discharge.**

43. At some point after his return from Europe, Mr. Nan requested a badge that would give him after-hours access to the Company's D.C. office (located in Crystal City, VA, close to the Pentagon). He did not receive this badge until June 6, 2024.

44. On May 22-31, 2024, Mr. Nan was away on military orders.

45. On May 24, 2024, while Mr. Nan was performing military duty, the Company issued a new security policy covering visitors to Company facilities. Amongst other things, this policy required all guests to be registered in a visitor database and issued a badge. It required foreign guests to be pre-registered three days before being hosted at Company facilities. Upon his return from military duty, the Company did not train Mr. Nan on its new policy.

46. On June 5, 2024, Mr. Nan traveled to Washington, D.C. to meet with a customer. They met at the customer's office, had dinner, and then went to the Company's D.C. office. Mr. Nan still did not have his Company badge, but he accessed the office with a visitor badge he had received (and been told to keep) on a previous visit. Mr. Nan and the customer spoke first inside the office, then outside on the terrace.

47. When Mr. Nan attempted to reenter the office to retrieve his personal belongings, the door had locked and he could not reenter. Mr. Nan was

eventually able to contact a coworker to gain access to the office. At no point did anyone tell Mr. Nan he had done anything wrong by bringing the customer to the office without registering or acquiring an extra badge for him.

48. On June 6, 2024, the assistant facility manager for the D.C. office met Mr. Nan, apologized for not being able to answer his call the previous evening, and presented him with his Company badge. She said nothing about any policies he had violated.

49. The head facility manager talked with Mr. Nan later in the day and said she was sorry he'd been locked out. She did not say anything about him having violated any policies. During the conversation, Mr. Nan commented that they had foreign guests coming in that evening.

50. The same day, Mr. Nan invited Mr. Tseng's Chief of Staff to have dinner with himself and the foreign guests who were in town, and who had dealings with the U.S. Department of Defense. Mr. Nan told the Chief of Staff that he thought it would be a good idea to bring these individuals to the Company's Crystal City office and show them around. She said, "yes, no problem," and said nothing about any policies requiring the guests to be registered, let alone registered three days in advance.

51. Mr. Nan, the Chief of Staff, and the Vice President of Growth hosted the foreign nationals at the Company office, to include giving them a quick tour of the office before stopping to talk in the lounge area. Afterwards, the six of them walked out of the office to have dinner together. During all this time, there was no mention of any guest registration policy.

**The communications that followed these "security incidents."**

52. On June 7, 2024, Mr. Ian Carlson, the Facility Security Officer for the D.C. office, contacted Mr. Nan about the policy violation (i.e., the failure to pre-

register the foreign guests).  This was the first Mr. Nan had heard about any three-day pre-registration requirement.  Mr. Ian  Carlson said Mr. Nan needed to speak with the foreign nationals and get their information, which Mr. Nan did.

53. On June 10, 2024, Mr. Nan saw that Mr. Ian Carlson had set up a meeting with him.  Mr. Nan contacted Mr. Chirls to ask what it was about.  Mr. Chirls said that the Company was conducting an investigation into his bringing visitors into the office and "breaking company policy."  Mr. Chirls said that Mr. Ian Carlson believed that Mr. Nan had not been "forthcoming" with information, a suggestion that naturally offended  Mr. Nan.

54. This "security meeting" was held the same day, with Mr. Nan, Mr. Chirls, Mr. Ian Carlson, and Mr. James Carlson all present.  Mr. Ian Carlson said he wanted to "capture" Mr. Nan's version of events.  Mr. Nan provided the information requested by Mr. Ian Carlson, including names and passport numbers for the foreign guests.  Mr. Nan asked Mr. Ian Carlson for the most up-to-date security protocol, which Mr. Ian Carlson provided.

55. Later in the day  Mr. Chirls responded to a group Teams message discussing the "security incident," saying, "Let's put a pause on this thread."  He then called Mr. Nan and had a heated discussion with him about how there might be "major security issues" with Mr. Nan's clearance.

56. On June 11, 2024, Mr. Ian Carlson had a call with the same attendees as the "security meeting."  Mr. Ian Carlson began to ask "investigative" questions in a hostile way.  Mr. Nan explained that he had several concerns, including a possible violation of his USERRA rights, since he had not been trained on the new company policies after his return from military service.  Mr. Nan then answered all of Mr. Ian Carlson's questions.

57. During this call, Mr. James Carlson commented that Mr. Nan's concerns made sense, that it was a simple policy violation and not a big issue.  He said, "This is

not the first time that a Foreign National has come into the office and not been registered and this won't be the last time this happens."

58. Later that day, Mr. Nan specifically asked for more training on the new policies, to make sure he would stay on the right side of them in the future.

59. Around this time—the exact date is uncertain—Mr. Nan had a discussion with the Chief of Staff (the one who'd been with him and the foreign guest the previous week) about his USERRA rights, pointing out that the Company had the obligation to train him when he returned from military service to make sure he could carry out his duties effectively, yet the Company had not trained him on the new registration policies that he was now being "investigated" for. The Chief of Staff shared that HR had reached out to her, and asked what should be done about Mr. Nan taking military leave.

60. On June 12, 2024, Mr. Chirls had a chat with Mr. Nan, involving both the "security incident" and Mr. Nan's upcoming military duty and Paid Time Off. This included the following exchange:

> **Mr. Chirls.** My understanding is the incident inquiry should close out within the next 24 hours. However, my concern is over BD [Business Development]/sales and our open work items and the reaction that followed the incident. Let's please connect when you are ready or able.

> **Mr. Nan.** Will do! What is the concern over BD/Sales and open work items?

> **Mr. Chirls.** I am not sure what to make of instantly going on military leave and inserting a bunch of PTO [Paid Time Off] over the next 2 months. We have a lot of deals, customers and things in flight we need to support. I just want to make sure we have the right coverage.

61. On June 13 or 14, 2024, Mr. Nan sent Mr. Ian Carlson and Mr. James Carlson a note of thanks for the information they had provided on the new security procedures. The "security" issue seemed to have been closed.

12

62. Prior to June 14, 2024, one of Mr. Nan's direct reports (i.e., an employee who reported directly to him) asked Mr. Nan for advice on joining the military Reserves. Mr. Chirls had advised this individual *not* to join the Reserves and then take a bunch of military leave, the way Mr. Nan had done.

63. Mr. Nan proactively scheduled a Teams video meeting with Mr. Alan Chirls on June 20, 2024, to discuss the previous events and apologize for any inconvenience the events may have caused. During the meeting Mr. Chirls asked, "Is Tate all in on deals or is he on military leave?"

64. On June 21, 2024, Mr. Nan proactively scheduled a Teams meeting with himself and Mr. Tseng to discuss the previous events and again to apologize for any inconvenience. The meeting ended with Mr. Tseng telling Mr. Nan that the Company trusted him and that he should not worry about the previous "security incident," but should use it as a learning experience.

**Mr. Nan resumes his good work.**

65. Despite the "security incidents" and his frequent military orders (June 11-14, then June 17-19), Mr. Nan continued to do good work for the company.

66. For example, on June 19, 2024, Mr. Nan communicated with Mr. Chirls about a recent sale, for which Mr. Nan had deconflicted a large issue. This enabled the customer to purchase over $3 million in equipment from the Company. Mr. Chirls responded, "niceeeeeeeee good work."

67. For another example, on July 9, 2024, Mr. Nan closed a deal with a customer for over $107,000 worth of training on drones.

68. During this time (June-July 2024), nobody complained to Mr. Nan about his work performance.

**The "security issue" comes up again.**

13

69. On July 9, 2024, Human Resources sent Mr. Nan a document titled "Counseling Documentation" with instructions that he sign it. This document concerned the incidents of June 5-6, and the unregistered visitors. It instructed Mr. Nan that he had fifteen days to complete additional training on the Company's security polices.

70. The document included one false statement: It claimed that Mr. Nan had been "corrected by the local Facility Manager" after he brought a customer into the office but before he brought the foreign nationals there.

71. Mr. Nan found this document highly suspicious, especially as he had raised the issue of his USERRA rights during the June 11 meeting. He talked to Mr. Chirls, who advised him not to "make a big deal" of it, but to "just sign it and let it pass." Mr. Chirls assured Mr. Nan that the incident would not affect Mr. Nan's security clearance.

72. On July 10, 2024, Mr. Nan asked several employees (including Mr. Chirls, Mr. Senbetta, Mr. Carlson, and Ms. Jacobs) why he was getting this document. Again, he raised his concern about his USERRA rights, as he had not been trained on the new policies after returning from military service.

**The final stages.**

73. On July 12, 2024, Mr. Nan had a phone call with Mr. James Carlson (chief legal officer and also ethics officer for the Company) to talk about his situation. Mr. James Carlson claimed that the "Counseling Documentation" was "not on his radar." Mr. Nan brought up his concerns about the inaccurate language on the statement, about his USERRA rights and the failure to train him on new standards, and about his other concerns.

74. One of Mr. Nan's other concerns related to the backdated SF 312 from the previous December. At the time Mr. Nan had not seen anything wrong with it,

but now that the Company was raising issues related to his security clearance, Mr. Nan was having some second thoughts about it.   Mr. Nan asked Mr. James Carlson to take particular note that he was reporting this himself, in case the issue came up later.

75. Mr. James Carlson suggested that the Counseling Statement was "just a recordkeeping event" and encouraged Mr. Nan to work with HR about correcting the inaccurate statement.  He did not make any significant comments about the backdated SF 312.

76. On July 15, Company HR refused to correct the inaccurate statement on the counseling documentation.  The department claimed to have "factual information" that it would not share, supporting its version of events.  The department also threatened that Mr. Nan could receive "further disciplinary action, up to and including termination," if he did not sign the statement by noon on July 16.

77. Mr. Nan signed the "counseling document" before noon on July 16.  His signature confirmed only that he had "received and reviewed" the document, not that the statements in it were true.

78. Four hours later, the HR department e-mailed Mr. Nan, informing him that "[his] employment at [the Company] is terminated, effective immediately, due to performance."

79. This "performance" claim was an obvious pretext.  Mr. Nan's performance continued to be excellent.  He had earned merit-based raises, promotions, and bonuses throughout his time at the company, and he had successfully enabled and closed sizable deals since returning from his extended military service. Insofar as the "security incidents" might be considered as performance issues, these resulted from the Company's own USERRA violation in failing to train a returning servicemember on the new policies.

80. The company's use of a flimsy pretext for firing Mr. Nan strongly suggests that it took this action in bad faith, with malice, such as would justify punitive damages under California law.

**Mr. Nan suffers financial harm from his termination.**

81. Shortly after being terminated by the Company, Mr. Nan mitigated his damages by seeking and obtaining extended mobilizations with the military. His military pay and allowances amounted to approximately $133,416 per year. In January 2025, Mr. Nan began work with another military contractor, where his total compensation is comparable to what he was making before.

82. If Mr. Nan had not been fired by the Company, he could have expected an annual income of over $350,000, to include a $150,000 bonus based on his team meeting its goals for the year. Under the Company's policy, if he had mobilized again and performed part-time work for the Company while mobilized (as he had done in 2023), he would have received his full Company salary for any week in which he did this.

83. Shortly before his termination, Mr. Nan applied for a medical "carrot" benefit related to his family, valued at $5000, which he lost because of his termination.

84. In addition, Mr. Nan lost the opportunities arising from a sizable stock option benefit. Under this benefit, if he had been able to work four years for the Company, he would have had the option to purchase up to 17,000 shares of Company stock at a fixed "strike price" of about $13.00 per share. Since the shares are worth about $86 now, this would have represented a considerable benefit for him. This benefit had *partially* vested at the time Mr. Nan was fired, but it was not practicable for him to exercise any part of it before it was lost to him. (If he had received his $150,000 bonus for 2024, he was planning to use that bonus to purchase as much as he could at that time.)

16

85. Mr. Nan conservatively estimates that he lost over $1 million in company equity through his wrongful termination.

**Mr. Nan suffers emotional distress from his wrongful termination.**

86. For some time after his wrongful termination, Mr. Nan suffered insomnia, had trouble focusing on time with his family, suffered stress over his reduced income as he is the main provider for his family, and suffered serious anxiety.

**Mr. Nan exhausts administrative remedies under 10 U.S.C. § 4701.**

87. On November 3, 2024, Mr. Nan filed a complaint with the U.S. Department of Defense Office of the Inspector General (DOD OIG), explaining the issue of the backdated SF 312 and security training forms. He also expressed his concern that he had been fired (at least in part) in retaliation for bringing up the issue of the backdated forms to Mr. James Carlson, the Company's chief legal officer and ethics officer.

88. June 1, 2025 marked 210 days after Mr. Nan filed his complaint, by which time DOD IG had not issued any order granting or denying relief on his complaint. Mr. Nan therefore exhausted his administrative remedies under 10 U.S.C. § 4701(c)(2).

## LEGAL CLAIMS

### COUNT 1 – WRONGFUL TERMINATION UNDER USERRA

89. Under USERRA, a person who performs Reserve military service "shall not be denied…retention in employment, promotion, or any benefit of employment by an employer on the basis of that…performance of service…or obligation." 38 U.S.C. § 4311(a). Likewise, an employer may not "discriminate in employment against or take any adverse employment action against" an employee who has

17

exercised a right provided for under USERRA. 38 U.S.C. § 4311(b). An employer "shall be considered" to have engaged in prohibited action against an employee if the employee's service or assertion of his rights "is a motivating factor in the employer's action." 38 U.S.C. § 4311(c)(1)-(2).

90. In addition, when an employee is absent for military service, the employer must treat that absence as a "leave of absence," 20 C.F.R. § 1002.153 (Dec. 19, 2005), and must make "reasonable efforts" to qualify a returning employee for the position he held at the time of his departure for military service, as required by 38 U.S.C. § 4313(a)(1)(B) and 20 C.F.R. § 1002.196 to 197 (Dec. 19, 2005). An employer must also permit an employee to take ordinary leave in addition to his military leave of absence as required by 20 C.F.R. § 1002.153 (Dec. 19, 2005).

91. The Company changed its security policies while Mr. Nan was performing military duty, and it failed to train him. Its decision violated his USERRA rights under 38 U.S.C. § 4313(a)(1)(B) and 20 C.F.R. § 1002.196 to 197 (Dec. 19, 2005). This decision also led to the "security incident" on June 6, 2024.

92. Mr. Nan cooperated completely with the Company's efforts to rectify the incident, but he also mentioned his USERRA rights and his concerns about those rights to several Company officers.

93. After several weeks of near-silence, the Company insisted that Mr. Nan sign a "counseling document" related to the security incident; and once the document was signed, the Company fired him four hours later.

94. The company's claim that Mr. Nan was fired for "performance" was an obvious pretext. Mr. Nan's performance over the previous year had been excellent, earning him a sizable bonus the previous February, and he was continuing to do excellent work right up to his last weeks with the Company.

95. On the other hand, Mr. Chirls and the Company's HR department had raised issues with Mr. Nan's continued military mobilizations, and his desire to take

18

ordinary leave in addition to his military leave, as he was entitled to do under 20 C.F.R. § 1002.153 (Dec. 19, 2005). The Company had also raised issues with the security incident, which resulted ultimately from the Company's failure to train Mr. Nan on his return from military duty. Between June 11 (at the latest) and July 12, Mr. Nan had raised the issue of his USERRA rights and their possible violation.

96. Mr. Nan's termination was based, at least in part, on his performance of military duty, on the results of the Company's USERRA violations, and on his decision to assert his USERRA rights. His termination therefore violated USERRA.

## COUNT 2 – VIOLATION OF 10 U.S.C. § 4701

97. The Company is a contractor that performs services for the Department of Defense. Mr. Nan's services to the Company related primarily to Department of Defense contracts.

98. The Company decided to have Mr. Nan backdate his SF 312 and his internal security training certificate in order to deceive the DCSA during an audit, to make the Company appear better, more careful, and more compliant with DOD policies than it actually was, so that the Company could continue to receive and work on DOD contracts. Its actions arguably violated 18 U.S.C. § 1001 (whether they *actually* violated this statute turns on the "materiality" of the date attached to Mr. Nan's signatures; and is not central to this case).

99. More importantly, when he came to consider the issue in light of later threats to his security clearance, Mr. Nan reasonably believed that this backdating issue *might* violate federal law or policy.

100. Mr. Nan reported this possible violation to the appropriate official within the company, Mr. James Carlson. Mr. Carlson is an employee of the Company, and as ethics officer he has responsibility to investigate, discover, or address misconduct.

101. Four days after Mr. Nan made this report, he was fired on a flimsy pretext of "performance."

102. Mr. Nan's termination was partly based on his decision to make a good faith report based on reasonable belief that the Company had violated federal law. His termination therefore violated 10 U.S.C. § 4701.

**COUNT 3 – VIOLATION OF CALIFORNIA LABOR CODE 1102.5**

103. The Company has its principal place of business in San Diego, California, and is therefore subject to California labor law.

104. Under Cal. Lab. Code § 1102.5(b), "an employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information…to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance…if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute…"

105. Under 18 U.S.C. § 1001, "whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact; (2) makes any materially false, fictitious, or fraudulent statement or representation; or (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry" is violating federal law.

106. When the Company instructed Mr. Nan to backdate his SF 312, it was at least arguably using a false writing with a materially false entry, namely the date of signature, to deceive the executive branch on matters related to Defense contracts, in violation of 18 U.S.C. § 1001. It was covering up the fact that one of its employees had had no current SF 312 with the Company for nearly 22 months.

20

107. Mr. Nan reported this fact to the company's ethics officer, Mr. James Carlson, on July 12, 2024. Four days later, he was fired.

108. Mr. Nan's termination was based, at least in part, on his reporting of a possible legal violation to a Company employee whose duties included investigating and correcting legal violations. Accordingly, his termination violated Cal. Lab. Code § 1102.5(b).

## DEMAND FOR RELIEF

Accordingly, Mr. Nan requests the following relief:

1. Compensatory damages, including lost back pay and benefits, in an amount to be determined by the jury;

2. Liquidated damages equal to the compensatory damages, as provided by 38 U.S.C. § 4323(d)(1)(D);

3. Damages for emotional distress, as permitted in actions under Cal. Lab. Code § 1102.5, in an amount to be determined by the jury;

4. Punitive damages, as permitted in actions under Cal. Lab. Code § 1102.5, in an amount to be determined by the jury;

5. The $10,000 civil penalty provided for under Cal. Lab. Code § 1102.5(f)(1);

6. All attorney's fees and costs of litigation (*see* 38 U.S.C. § 4323(h)(2));

7. Appropriate equitable relief, if necessary including front pay as a monetary substitute for reinstatement, as determined by the court.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, the plaintiff demands trial by jury on all issues.

Dated: July 14, 2025
Orange County, California

21

TATE NAN

By his Attorney:

Ryan C. Nerney, Esq.
Managing Partner
TULLY RINCKEY, PLLC
999 Corporate Drive, Suite 100
Ladera Ranch, CA 92694
Phone: (619) 354-6443
Fax: (619) 357-7616
rnerney@fedattorney.com