UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TATE NAN,<br><br>                              Plaintiffs,<br><br>v.<br><br>SHIELD AI, INC.,<br><br>                              Defendant. | Case No.:  25-CV-1798 JLS (MSB)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT SHIELD AI, INC.'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT**<br><br>(ECF No. 23) |

Presently before the Court is Defendant Shield AI, Inc.'s ("Shield AI" or "Defendant") Motion to Dismiss Plaintiff's Complaint ("Mot.," ECF No. 23).  Also before the Court is Plaintiff Tate Nan's Response and Opposition to Defense Motion to Dismiss Complaint ("Opp'n," ECF No. 26), and Defendant's Reply in Support of Defendant's Motion to Dismiss ("Reply," ECF No. 30).  After reviewing Plaintiff's Complaint ("Compl.," ECF No. 1), the Parties' arguments, and the relevant law, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion (ECF No. 23).

### BACKGROUND

Plaintiff Tate Nan joined the U.S. Air Force Reserve in 2015 as a pilot.  Compl. ¶ 13.  Plaintiff spent over four years on active duty, including deployments to the Middle East.  *Id.*  Defendant Shield AI is a national security company that supports the Department

of Defense ("DOD" or "DoD").  Mot. at 13.  On December 6, 2021, after working with other technology defense companies for three years, Plaintiff accepted a position with Defendant as a "Senior Business Development Account Executive."  Compl. ¶¶ 14–16. Plaintiff alleges that he was very successful in his role.  *Id.* ¶¶ 16–21.  During 2022, Plaintiff's supervisor, Alan Chirls, described Plaintiff as a "sales leader on the team" and a "critical contributor to the success of our organization."  *Id.* ¶ 17.  Chirls also stated that Plaintiff "demonstrated incredible work ethic and grit while working around the clock to push existing deals forward and generate new business."  *Id.*  Throughout 2023, Chirls described Plaintiff's performance as "very strong" and that he was considered a "subject matter expert" that "consistently drives outstanding outcomes."  *Id.* ¶ 18.  In March 2023, Plaintiff was promoted to Senior Manager, Business Development Accounts, which was classified as a "Merit Increase" based on his "excellent work performance."  *Id.* ¶ 19.

During this period, Plaintiff was activated for military service for about forty-one days (between December 2022 and mid-August 2023) and thirty-eight days with an extension for "several additional months" (between August 11, 2023, and March 27, 2024), which Defendant "gave him no trouble" about.  *Id.* ¶¶ 23–25.  While on military duty, Plaintiff continued to do work for Defendant when time permitted, such as supervising his subordinates, speaking with Chirls, introducing other Shield AI officials to connections, and working on some contracts.  *Id.* ¶¶ 26–31.  Plaintiff was successful during this period, including a bonus in February of 2024, "based on the performance of his team," where Chirls noted to Plaintiff that there were "obviously no penalties as you are considered working when out," i.e., on military leave.  *Id.* ¶ 29.

Plaintiff's position with Shield AI required access to classified information.  *Id.* ¶ 32.  As a part of Plaintiff's clearance, he was required to execute Standard Form ("SF") 312, which is "an agreement showing that he understands his obligations not to reveal classified information to unauthorized persons."  *Id.* ¶ 33 (citing 32 C.F.R. § 2001.80(d)(2)).  When Plaintiff joined Shield AI, he had already executed a SF 312 with the military, and he was not asked to execute another until December 1, 2023.  *Id.* ¶¶ 34–

25-CV-1798 JLS (MSB)

35. On December 1, 2023, while on military duty, Plaintiff received an email from Renee Connor, one of Shield AI's Facility Security Officers, requesting that Plaintiff sign documents, including a new SF 312 and an acknowledgment of having received an Initial Security Briefing from the Company. *Id.* ¶ 35. Plaintiff alleges that he did not remember receiving this briefing, but Connor had provided him with PowerPoint slides on the subject in the same email. *Id.* Plaintiff alleges that Connor asked him to "backdate his signatures to February 22, 2022, i.e., about [twenty-two] months before he was actually signing them." *Id.* ¶ 37. Connor claimed that this was necessary "because of an upcoming audit by the Defense Counterintelligence and Security Agency (DCSA), a Government agency that supervises contractors to ensure that they are complying with DOD security requirements." *Id.* Plaintiff alleges that, at the time, "[h]e did not see anything wrong with backdating the forms, particularly as he had already signed another SF 312 with the military." *Id.* ¶ 38. Plaintiff backdated the SF 312 and did not think about it again until issues arose regarding "security incidents" in June of 2024. *Id.*

From May 22, 2024, to May 31, 2024, Plaintiff was away on military orders. *Id.* ¶ 44. During this period, Shield AI implemented a new security policy covering visitors to their facilities, requiring all guests to register in a visitor database and be issued a badge. *Id.* ¶ 45. It further required foreign guests to be pre-registered three days in advance of any visit to Shield AI's facilities. *Id.* On June 5, 2024, Plaintiff traveled to Washington, D.C. to meet with a customer. *Id.* ¶ 46. Petitioner and the customer got dinner and then went to Shield AI's D.C. office, located in Crystal City, Virginia, where they spoke inside the office and on the terrace. *Id.* Plaintiff's badge—a visitor badge since he was still waiting for his official badge—would not allow re-access to the office once they were on the terrace. *Id.* ¶ 47. Plaintiff called a co-worker, who let them back inside the office. *Id.* "At no point did anyone tell [Plaintiff] he had done anything wrong by bringing the customer to the office without registering or acquiring an extra badge for him." *Id.*

On June 6, 2024, the assistant facility manager for the D.C. office apologized for being unable to help Plaintiff the previous evening and gave Plaintiff his official company

25-CV-1798 JLS (MSB)

badge. *Id.* ¶ 48. "She said nothing about any policies he had violated." *Id.* Later that day, Plaintiff invited the Co-Founder of Shield AI's Chief of Staff to have dinner with him and foreign guests who had dealings with the DOD. *Id.* ¶ 50. Plaintiff mentioned that it would be a good idea to bring the foreign guests to the D.C. office to show them around. *Id.* The Chief of Staff "said nothing about any policies requiring the guests to be registered, let alone registered three days in advance." *Id.* That night, Plaintiff, the Chief of Staff, and the Vice President of Growth "hosted the foreign nationals at the [Shield AI] office," including giving them a tour. *Id.* ¶ 51. "During all this time, there was no mention of any guest registration policy." *Id.*

On June 7, 2024, Ian Carlson, the Facility Security Officer for the D.C. office, contacted Plaintiff about the policy violation (i.e., the failure to pre-register the foreign guests), informing Plaintiff for the first time about the three-day pre-registration requirement. *Id.* ¶ 52. Ian Carlson requested the foreign guest's information, which Plaintiff provided. *Id.* In the following days, multiple meetings were held to discuss the security incident, resulting in Chirls stating that there might be "major security issues" with Plaintiff's clearance. *Id.* ¶¶ 53–55. Throughout these meetings, Plaintiff raised concerns, "including a possible violation of his [Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA")] rights, since he had not been trained on the new company policies after his return from military service." *Id.* ¶ 56. In one of these meetings, James Carlson, Chief Legal Officer and Ethics Officer for Shield AI, "commented that [Plaintiff's] concerns made sense, that it was a simple policy violation and not a big issue," and further stated that "[t]his is not the first time that a Foreign National has come into the office and not been registered and this won't be the last time this happens." *Id.* ¶ 57.

Plaintiff repeatedly sought information and training on the new security policies since Shield AI "had not trained him on the new registration policies that he was now being 'investigated' for." *Id.* ¶ 59. Plaintiff also had a conversation with the Chief of Staff, who attended the dinner with the foreign guests, about his USERRA rights. *Id.* The Chief of

25-CV-1798 JLS (MSB)

Staff "shared that HR had reached out to her and asked what should be done about [Plaintiff] taking military leave." *Id.*

On June 12, 2024, Chirls, Plaintiff's supervisor, called Plaintiff to discuss the security incident and Plaintiff's upcoming military duty and Paid Time Off ("PTO"). *Id.* ¶ 60. Plaintiff alleges that in this conversation, Chirls stated that "the incident inquiry should close out within the next 24 hours," but expressed concerns over "going on military leave and inserting a bunch of PTO over the next [two] months." *Id.* Plaintiff also learned that Chirls had told one of Plaintiff's subordinates "*not* to join the Reserves and then take a bunch of military leave, the way [Plaintiff] had done." *Id.* ¶ 62. On June 20, 2024, Plaintiff scheduled a call with Chirls to apologize for any inconvenience, during which Chirls asked, "Is [Plaintiff] all in on deals or is he on military leave?" *Id.* ¶ 63.

On June 21, 2024, Plaintiff scheduled a call with Brandon Tseng, Co-Founder of Shield AI, to discuss the security incident and apologize for any inconveniences caused. *Id.* ¶ 64. During this call, Tseng told Plaintiff that Shield AI "trusted him and that he should not worry about the previous 'security incident,' but should use it as a learning experience." *Id.* Plaintiff then resumed working, closing several large deals for Shield AI and receiving no complaints about his work performance. *Id.* ¶¶ 65–68.

On July 9, 2024, HR sent Plaintiff "Counseling Documentation" concerning the "incidents of June 5-6" and the unregistered visitors, with instructions to sign it and complete additional training on Shield AI's security policies. *Id.* ¶ 69. Plaintiff noted that the document "included one false statement: It claimed that [Plaintiff] had been 'corrected by the local Facility Manager' after he brought a customer into the office but before he brought the foreign nationals there." *Id.* ¶ 70. Plaintiff found this document "highly suspicious," as it came after he "raised the issue of his USERRA rights," but Chirls advised him to not "make a big deal" of it and to "just sign it and let it pass." *Id.* ¶ 71. On July 10, 2024, Plaintiff asked several employees, including Chirls, why he was receiving this document, again expressing concerns about his USERRA rights. *Id.* ¶ 72.

/ / /

25-CV-1798 JLS (MSB)

On July 12, 2024, Plaintiff called James Carlson, the Chief Legal Officer and Ethics Officer, to discuss the document, raising concerns about the inaccurate language, his USERRA rights, and the failure to train him on the new policies. *Id.* ¶ 73. Carlson claimed the "Counseling Documentation" was "not on his radar," but assured him that it was "just a recordkeeping event" and encouraged Plaintiff to work with HR about correcting the inaccurate statement. *Id.* ¶¶ 73, 75. Plaintiff also raised concerns regarding the backdated SF 312, as he was now concerned about his clearance due to the security incidents. *Id.* ¶ 74. Plaintiff asked Carlson "to take particular note that he was reporting this himself, in case the issue came up later." *Id.*

On July 15, 2024, HR "refused to correct the inaccurate statement," claiming they had "factual information" supporting their version in the document, and told him that Plaintiff could receive "further disciplinary action, up to and including termination" if he did not sign the statement by July 16, 2024, at noon. *Id.* ¶ 76. Plaintiff signed the document before the deadline, noting his signature only confirmed that he had "received and reviewed" the document, "not that the statements were true." *Id.* ¶ 77. "Four hours later, the HR department emailed [Plaintiff], informing him that '[his] employment at [Shield AI] is terminated, effective immediately, due to performance.'" *Id.* ¶ 78. Plaintiff alleges that blaming his termination on his "performance" is an "obvious pretext," as his performance was excellent, earning "merit-based raises, promotions, and bonuses throughout his time at the company" and "successfully enabl[ing] and clos[ing] sizable deals since returning from his extended military service." *Id.* ¶ 79.

On November 3, 2024, Plaintiff filed a complaint with the U.S. Department of Defense Office of the Inspector General, explaining his concerns with the backdated SF 312 and potential retaliatory termination for bringing up the issue with James Carlson, the Chief Legal Officer and Ethics Officer.[1] *Id.* ¶ 87. Plaintiff had not received a response

---

[1] Regarding the Defense Contractor Whistleblower Protection Act, 10 U.S.C. § 4701 "require[s] that a person allegedly subjected to reprisals for making a protected disclosure must first submit a complaint to

25-CV-1798 JLS (MSB)

after 210 days and waited until after that time passed to file the current action. *Id.* ¶ 88. Plaintiff now brings the present suit against Defendant arguing (1) Wrongful Termination under the USERRA (38 U.S.C. § 4311(a)–(b)); (2) violation of the Defense Contractor Whistleblower Act ("DCWPA") (10 U.S.C. § 4701); and (3) violation of California Labor Code § 1102.5. *Id.* ¶¶ 89–108.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) permits a party to raise by motion the defense that the complaint "fail[s] to state a claim upon which relief can be granted." To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the facts pled "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. That is not to say that the claim must be probable, but there must be "more than a sheer possibility that a defendant has acted unlawfully." *Id*. Facts "'merely consistent with' a defendant's liability" fall short of a plausible entitlement to relief. *Id*. (quoting *Twombly*, 550 U.S. at 557).

Though this plausibility standard "does not require 'detailed factual allegations,' . . . it [does] demand[] more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id*. (quoting *Twombly*, 550 U.S. at 555). In other words, a complaint will not suffice "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*. (alteration in original) (quoting *Twombly*, 550 U.S. at 557). Put differently, "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

Review under Rule 12(b)(6) requires a context-specific analysis involving the Court's "judicial experience and common sense." *Iqbal*, 556 U.S. at 679. In performing

---

the Inspector General of the appropriate agency." *Turner v. BAE Sys., Inc.*, No. 25-CV-463-DKW-WRP, 2026 WL 963080, at *5 (D. Haw. Apr. 9, 2026) (citing 10 U.S.C. § 4701(c)(1)).

25-CV-1798 JLS (MSB)

that analysis, "a district court must accept as true all facts alleged in the complaint, and draw all reasonable inferences in favor of the plaintiff." *Wi-LAN Inc. v. LG Elecs., Inc.*, 382 F. Supp. 3d 1012, 1020 (S.D. Cal. 2019). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (second alteration in original). If a complaint does not survive Rule 12(b)(6), a court grants leave to amend unless it determines that no modified contention "consistent with the challenged pleading could . . . possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986).

## DISCUSSION

On September 29, 2025, Defendant filed the present Motion arguing that (1) Plaintiff's claim that Shield AI failed to make "reasonable efforts" to qualify him for reemployment is not actionable under the USERRA; (2) Plaintiff's USERRA discrimination claim fails due to Defendant's repeated support and advancement of Plaintiff; (3) Plaintiff's DCWPA claim fails because his alleged disclosure is unprotected, Shield AI was not on notice, and Plaintiff fails to plead causation; (4) Plaintiff's California whistleblower claim is factually insufficient and cannot be applied to Shield AI under extraterritoriality principles; and (5) there is a legitimate and nondiscriminatory reason behind Plaintiff's termination. *See generally* Mot. The Court addresses each argument in turn.

## I.    Uniformed Services Employment and Reemployment Rights Act of 1994

Plaintiff argues that by failing to train him on the new security policy after Plaintiff returned from military service, Shield AI violated his USERRA rights under 38 U.S.C. § 4313(a)(1)(B) and 20 C.F.R. § 1002.196–197. Compl. ¶ 91. Plaintiff alleges that the failure to train him on the new policy led to the "security incident" on June 6, 2024. *Id.* Plaintiff further alleges that he discussed concerns surrounding his USERRA rights close to the time of his termination, Chirls and HR had "raised issues with [Plaintiff's] continued military mobilizations, and his desire to take ordinary leave in addition to his military leave,

as he was entitled to under 20 C.F.R. § 1002.153," and that his ultimate termination based on "performance" was an obvious pretext. *Id.* ¶¶ 92–95. Plaintiff thus concludes that his "termination was based, at least in part, on his performance of military duty, on the results of [Shield AI's] USERRA violations, and on his decision to assert his USERRA rights." *Id.* ¶ 96.

"The Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. §§ 4301–4335, is designed to, among other things, encourage noncareer service in the uniformed services by 'prohibit[ing] discrimination against persons because of their service in the uniformed services.'" *Ouimette v. Cnty. of Los Angeles*, No. 12-CV-6268-ODW, 2012 WL 6214305, at *3 (C.D. Cal. Dec. 12, 2012) (quoting 38 U.S.C. § 4301(a)). "The USERRA authorizes two types of actions, covering both claims for (1) failure to reemploy pursuant to 38 U.S.C. § 4312 [and § 4313], which do not require proof of intent, and (2) intentional discrimination or retaliation under 38 U.S.C § 4311, which applies both to initial employment and reemployment, and require[s] proof of intent." *Cazares v. City of El Centro*, No. 20-CV-1571-BEN-RBM, 2021 WL 807680, at *7 (S.D. Cal. Mar. 3, 2021) (first citing *Huhmann v. Fed. Express Corp.*, 874 F.3d 1101, 1105 (9th Cir. 2017); and then citing *Wallace v. City of San Diego*, 479 F.3d 616, 624–25, n.1 (9th Cir. 2007)).

While somewhat unclear, the Court construes Plaintiff's Complaint to bring claims under §§ 4312 and 4313 for failure to reemploy due to Shield AI's failure to train Plaintiff on the updated security policies and under § 4311 for discriminating against and terminating Plaintiff based on his military service. *See* Compl. ¶¶ 89–96. The Court addresses each in turn.

### A. Reemployment Claim Under 38 U.S.C. §§ 4312 and 4313

"USERRA requires 'the prompt reemployment' of eligible servicemembers upon the completion of their military service, and prohibits 'discrimination against persons because of their service in the uniformed services.'" *Belaustegui v. Int'l Longshore and Warehouse Union*, 36 F.4th 919, 923 (9th Cir. 2022) (quoting 38 U.S.C. § 4301(a)(2)–(3)). Section 4312 provides that "any person whose absence from a position of employment is

9

necessitated by reason of service in the uniformed services [is] entitled to the reemployment rights and benefits," subject to notice requirements not at issue here. 38 U.S.C. § 4312(a).

Section 4313 states in part:

> [A] person entitled to reemployment under section 4312, upon completion of a period of service in the uniformed services, shall be promptly reemployed in a position of employment in accordance with the following order of priority: [I]n the case of a person whose period of service in the uniformed services was for less than 91 days--
>
> > (A) in the position of employment in which the person would have been employed if the continuous employment of such person with the employer had not been interrupted by such service, the duties of which the person is qualified to perform; or
> >
> > (B) in the position of employment in which the person was employed on the date of the commencement of the service in the uniformed services, only if the person is not qualified to perform the duties of the position referred to in subparagraph (A) after reasonable efforts by the employer to qualify the person.

38 U.S.C. § 4313(a)(1)(A)–(B)

The position described in subsection (A) is referred to as the "escalator position" and represents the idea "that a returning service member [is] not [to] be removed from the progress ('escalator') of his career trajectory." *Belaustegui*, 36 F.4th at 924 (quoting *Huhmann*, 874 F.3d at 1105); 20 C.F.R. § 1002.196(a). Subsection (B) describes the scenario where "the service member fails to qualify for either the escalator position or a comparable position in spite of the employer's reasonable efforts . . . to qualify the employee for such positions." *Ouimette*, 2012 WL 6214305, at *4 (citing 38 U.S.C. § 4313(a)(2)(A)–(B)). If this occurs, "then the employee is entitled to reemployment in the position most nearly approximating the escalator position." *Id.*

Defendant first argues that Plaintiff "fundamentally misinterprets [the] USERRA's statutory framework" by alleging that Shield AI violated the USERRA when they failed to

train him on a new security policy after he had taken seven business days of military leave. Mot. at 16. Defendant asserts that under 38 U.S.C. § 4313(a)(1)(A)-(B), "an employee returning from a period of service of less than [ninety-one] days is first entitled to reemployment in the escalator position described in subsection (A)." *Id.* at 17. "If the employee is not qualified to perform the duties of that position, subsection (B) requires the employer to make 'reasonable efforts' to qualify the employee." *Id.* (citing 38 U.S.C. § 4313(a)(1)(B)). Defendant thus concludes that Shield AI complied with § 4313 "by timely reinstating Plaintiff to his prior position—i.e., the position he would have had absent his [seven-day] military leave," and since Plaintiff does not allege that he was unqualified to resume that role, subsection (B) is inapplicable. *Id.* (citing 38 U.S.C. § 4312(a)(1)(A)). Defendant asserts that Plaintiff misinterprets the USERRA framework because "subsection (B) does not contain a standalone requirement that an employer make 'reasonable efforts' to qualify an individual for a position." *Id.* Rather, "reasonable efforts" is "a conditional obligation that applies only when the employee is not qualified to perform the duties of the position to which they would otherwise be entitled." *Id.*

The Court agrees with Defendant that Shield AI satisfied its obligation for reemployment under §§ 4312 and 4313 when Plaintiff was reinstated to his pre-service position after his seven-business-day military leave. Mot. at 17; Compl. ¶¶ 44–47. Qualified "means that the employee has the ability to perform the essential tasks of the position." 20 C.F.R. § 1002.198(a)(1). Plaintiff does not allege that he was unqualified for the "escalator position," i.e., his pre-service position, and therefore, Defendant did not violate § 4313 by failing to train Plaintiff on the new security policies. The "reasonable efforts" obligation would arise if Plaintiff were not qualified for his prior position, which Plaintiff does not allege. *See Ouimette*, 2012 WL 6214305, at \*4. Therefore, based on Plaintiff's allegations, Shield AI's obligation to "make reasonable efforts to help the employee become qualified to perform the duties of [the] position" was not triggered. 20 C.F.R. § 1002.198.

/ / /

25-CV-1798 JLS (MSB)

Further, Plaintiff fails to provide any support for his understanding of the USERRA's "reasonable efforts" obligation—that the employer violates § 4313 if the employer fails to train an employee on a new policy where the employee is otherwise qualified for the position. Opp'n at 14–16. Therefore, Defendant's failure to train Plaintiff on the new security policy alone does state a claim for a violation of the USERRA, and Defendant's Motion is **GRANTED IN PART** as to this claim. Plaintiff's failure to reemploy claim is **DISMISSED WITH LEAVE TO AMEND**.

### B. Discrimination Claim Under § 4311

Section 4311(a) states that a servicemember "shall not be denied . . . retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, . . . performance of service, . . . or obligation." 38 U.S.C. § 4311(a). "An employer may not discriminate in employment against or take any adverse employment action or other retaliatory action against any person because such person . . . has taken an action to enforce a protection afforded any person under [the USERRA] . . . or . . . has exercised a right provided for in [the USERRA]." § 4311(b). An employer is considered to have engaged in a prohibited action if the employee's service or assertion of his rights "is a motivating factor in the employer's action." § 4311(c)(1). "To establish an USERRA discrimination claim, a plaintiff must establish: (1) membership in the armed services; (2) an adverse employment decision; and (3) that the employee's military service was a motivating factor in the employer's adverse decision." *Hartman v. Canyon Cnty.*, No. 20-CV-26-CWD, 2021 WL 4847426, at *6 (D. Idaho Oct. 18, 2021) (first citing 38 U.S.C. § 4311(c)(1); and then citing *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002)).

The Ninth Circuit applies "a two-part test to § 4311 discrimination claims." *Belaustegui*, 36 F.4th at 924. "An employee 'first has the burden of showing, by a preponderance of the evidence, that his or her protected status was a substantial or motivating factor in the adverse employment action; the employer may then avoid liability only by showing, as an affirmative defense, that the employer would have taken the same action without regard to the employee's protected status.'" *Id.* (quoting *Huhmann*, 874

25-CV-1798 JLS (MSB)

F.3d at 1105). "To be considered a motivating factor, a service member's military status need only be one of many factors the employer considers in reaching an employment decision." *Ouimette*, 2012 WL 6214305, at *5 (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 417–18 (2011)). "Military service is a motivating factor for an adverse employment action if the employer 'relied on, took into account, considered, or conditioned its decision' on the employee's military-related absence or obligation." *McMillan v. Dep't of Just.*, 812 F.3d 1364, 1372 (Fed. Cir. 2016) (quoting *Erickson v. U.S. Postal Serv.*, 571 F.3d 1364, 1368 (Fed. Cir. 2009)); *see also Baker v. United Parcel Serv., Inc.*, No. 23-4364, 2024 WL 5001476, at *1 (9th Cir. Dec. 6, 2024) ("An employee's military status need not be the 'sole motivation' for the adverse decision; the military service need only be 'a substantial or motivating factor.'" (quoting *Sheehan v. Dep't of Navy*, 240 F.3d 1009, 1013 (Fed. Cir. 2001)).

"A USERRA plaintiff can establish the 'motivating factor' element through direct or circumstantial evidence." *Munoz v. InGenesis STGI Partners, LLC*, 182 F. Supp. 3d 1097, 1104 (S.D. Cal. 2016) (citing *Sheehan*, 240 F.3d at 1014). Circumstantial evidence can include:

> (a) the "employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity;" (b) the "disparate treatment of certain employees compared to other employees with similar work records;" (c) the proximity in time between exercising the protected activity and the adverse action; (d) the employer's failure to follow its own policies; (e) inconsistencies between the employer's proffered reason and its other actions; and (f) the employer's history of discrimination.

*Id.* (quoting *Sheehan*, 240 F.3d at 1014). To survive a motion to dismiss, a plaintiff "is tasked only with alleging a claim plausible enough for the Court 'to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Ouimette*, 2012 WL 6214305, at *5 (quoting *Iqbal*, 556 U.S. at 678). Further, "[a]s a law advancing the interests of veterans, USERRA is 'liberally construed for the benefit of those who left private life to serve their country in its hour of great need.'" *Belaustegui*, 36 F.4th at 923

(quoting *Ziobar v. BLB Res., Inc.*, 839 F.3d 814, 819 (9th Cir. 2016)).

Defendant argues that "Plaintiff identifies no specific acts, statements, or circumstances indicating that Shield AI harbored discriminatory animus toward his service in the military or that his termination was connected to that service." Mot. at 20. Defendant contests that Plaintiff's "attempt to demonstrate military animus through a couple of innocuous remarks allegedly made by his supervisor is unavailing." *Id.* Further, Defendant asserts that the Complaint "clearly reflects the company's respect for [Plaintiff's] military service *and* awareness of USERRA's employment protections." *Id.* at 21.

Plaintiff alleges that his USERRA claim is not based on any conduct from December 2021 through May 2024, as Shield AI "gave [Plaintiff] no trouble over his military leave" during this period. Opp'n at 12. However, in June of 2024, Chirls, Plaintiff's supervisor, "complained about his intent to take Paid Time Off (PTO) in addition to his military leave" and "advised another employee *not* to join the reserves and then take a bunch of military leave, the way [Plaintiff] had done." *Id.* (citing Compl. ¶¶ 60, 62). Plaintiff further alleges that around this time he began to raise his USERRA rights in connection with the changed security policy, and Shield AI's HR department asked Co-Founder Tseng's Chief of Staff "what should be done" about Plaintiff's military service. *Id.* (citing Compl. ¶¶ 59, 60). Plaintiff further alleges that the reason for his firing—concerns over his "performance"—was a pretext because his "performance was excellent throughout his time at the company" and "no one complained about his work performance during his last months at the company." *Id.* at 14 (citing Compl. ¶¶ 17–19, 39–42, 65–68, 79). Plaintiff then argues that Defendant's failure to train Plaintiff on the new security policy, inconsistent statements surrounding the seriousness of the security incident from high-level Shield AI employees, and the presence of Shield AI employees at the security incident who failed to mention the new policy to him, all provide further evidence of a pretextual reason for his termination. *Id.* at 15.

The Court finds that these allegations allege "a claim plausible enough for the Court 'to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"

25-CV-1798 JLS (MSB)

*Ouimette*, 2012 WL 6214305, at *5 (quoting *Iqbal*, 556 U.S. at 678). First, there is no dispute that Plaintiff is a member of the U.S. Air Force Reserve. Compl. ¶ 13. Second, Plaintiff was terminated from his employment with Defendant, which constitutes an "adverse employment action." *Belaustegui*, 36 F.4th at 924. Therefore, at issue before the Court is whether Plaintiff sufficiently alleges that his military status was "a motivating factor" in his termination. *McMillan*, 812 F.3d at 1372.

Taking Plaintiff's allegations as true, in the period leading up to his termination, his supervisor and HR made comments expressing frustration with the amount of time Plaintiff had been on military leave, including asking whether Plaintiff was "all in on deals or is he on military leave?" Compl. ¶ 63. Chirls also expressed that he was "not sure what to make of instantly going on military leave and inserting a bunch of PTO over the next two months" and discouraged another employee from doing what Plaintiff did and "take a bunch of military leave." *Id.* ¶¶ 60–62.

Further, while Defendant's termination notice stated that Plaintiff was terminated based on his "performance," Plaintiff alleges that he was extremely successful throughout his tenure with Shield AI, including while on military duty. *See* Compl. ¶¶ 17–19, 39–42, 65–68, 79; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) ("Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."). Defendant then argues that "the Complaint concedes a legitimate and facially reasonable basis for Plaintiff's termination: violation of the company's security policies." Mot. at 31. While the Court finds that, as pled, Defendant's failure to train Plaintiff on the updated security policy is insufficient to state a claim for a USERRA violation, Defendant's failure to train Plaintiff on the policy and inconsistent treatment of the security violation after the incident provides further evidence of a pretextual termination. *See Munoz*, 182 F. Supp. 3d at 1104 (citing *Sheehan*, 240 F.3d at 1014) (finding circumstantial evidence of the "motivating factor" element to include "inconsistencies between the employer's proffered reason and its other actions").

15

25-CV-1798 JLS (MSB)

For example, when Plaintiff first brought an unregistered guest to Shield AI's office, a co-worker came to let Plaintiff and the guest back into the office. Compl. ¶ 47. The following day, the assistant facility manager and the head facility manager for Shield AI's D.C. office met with Plaintiff and apologized that he had been locked out. *Id.* ¶¶ 48–49. Taking Plaintiff's allegations as true, none of these Shield AI employees informed Plaintiff of the new security policy during these interactions. *Id.* ¶ 47. The following day, Plaintiff, the Co-Founder's Chief of Staff, and the Vice President of Growth, all brought unregistered foreign nationals into Shield AI's D.C. office. *Id.* ¶¶ 50–51. Again, no one informed Plaintiff of the new security policy, and Plaintiff was the only individual disciplined for the violation. *Id.* ¶¶ 6, 51.

Following the security incidents, Plaintiff was repeatedly told by high-ranking members of Shield AI that the security incident was not a big deal and would pass quickly. For example, James Carlson, Chief Legal Officer and Ethics Officer, told Plaintiff that the security incident "was a simple policy violation and not a big issue," that it was "not the first time that a Foreign National has come into the office and not been registered," and that it "won't be the last time this happens." *Id.* ¶ 57. Further, Tseng, the Co-Founder of Shield AI, told Plaintiff that Shield AI "trusted him and that he should not worry about the previous 'security incident,' but should use it as a learning experience." *Id.* ¶ 64. Finally, Chirls, Plaintiff's supervisor, informed him that the "incident inquiry should close out within the next [twenty-four] hours" and that Petitioner should just sign the Counseling Documentation and "let it pass." *Id.* ¶¶ 60, 71. Additionally, Plaintiff alleges that the other employees who were with Plaintiff at the time of the security incidents "were not disciplined" for their involvement. *Id.* ¶ 6. If the security incidents were an offense justifying termination, as Defendant now suggests, the treatment of the incidents during and after their occurrence and the disparate treatment of Plaintiff compared to the others involved are inconsistent with that conclusion. This inconsistent treatment, statements expressing frustration with Plaintiff's military leave, and Plaintiff's success at Shield AI, all provide circumstantial evidence sufficient to state a claim for a § 4311 discrimination

claim. *See Munoz*, 182 F. Supp. 3d at 1104 (citing *Sheehan*, 240 F.3d at 1014) ("A USERRA plaintiff can establish the 'motivating factor' element through direct or circumstantial evidence.").

Based on this, the Court concludes that Shield AI plausibly "'relied on, took into account, considered, or conditioned its decision' on [Plaintiff's] military-related absence or obligation." *McMillan*, 812 F.3d at 1372 (quoting *Erickson*, 571 F.3d at 1368); *see also Hartman*, 2021 WL 4847426, at \*7 (finding sufficient allegations to state a claim where the plaintiff "alleged specific facts linking [the employer's] decision to terminate his employment to his [military] status" as that "is all that is required under Rule 12(b)(6)"). Therefore, Defendant's Motion is **DENIED** as to this claim.

## II.    Defense Contractor Whistleblower Protection Act

Under the Defense Contractor Whistleblower Protection Act ("DCWPA"), 10 U.S.C. § 4701, "[a]n employee of a contractor . . . may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing to a person or body . . . information that the employee reasonably believes is evidence of . . . a violation of law, rule, or regulation related to a Department contract (including the competition for or negotiation of a contract) or grant." *Kappouta v. Valiant Integrated Servs., LLC*, 60 F.4th 1213, 1216 (9th Cir. 2023) (quoting 10 U.S.C. § 4701(a)(1)(A)). "Therefore, to survive a motion to dismiss under the DCWPA, a plaintiff must plausibly allege that: (1) she made a disclosure that the plaintiff reasonably believed is evidence of a violation related to a DoD contract; and (2) her employer discharged, demoted, or otherwise discriminated against her because of that disclosure." *Id.* (cleaned up). To give rise to whistleblower protection, "the disclosure must be one that the plaintiff reasonably believes is related to an act described in § 4701(a)(1)(A)–(C)." *Id.* at 1217. For example, information that the employee reasonably believes is evidence of "a violation of law, rule, or regulation related to a Department contract." § 4701(a)(1)(A). The protected communications only need to be "a contributing factor" to the employer's adverse action to be actionable. *Lillie v. ManTech Int'l. Corp.*, No. 17-CV-2538-CAS-SSx, 2019 WL 3387732, at \*16 (C.D. Cal.

July 26, 2019), *aff'd sub nom.*, 837 F. App'x 455 (9th Cir. 2020) (first citing *United States ex rel. Cody v. Mantech Int'l Corp.*, 207 F. Supp. 3d 610, 624 (E.D. Va. 2016); and then citing *Cejka v. Vectrus Sys. Corp.*, 292 F. Supp. 3d 1175, 1192 (D. Colo. 2018)).

Plaintiff alleges that Shield AI "decided to have [Plaintiff] backdate his SF 312 and his internal security training certificate in order to deceive the [Defense Counterintelligence and Security Agency ("DCSA")] during an audit, to make [Shield AI] appear better, more careful, and more compliant with DOD policies than it actually was, so that [Shield AI] could continue to receive and work on DOD contracts." Compl. ¶ 98. When Plaintiff considered this incident "in light of the later threats to his security clearance," Plaintiff alleges that he "reasonably believed that this backdating issue *might* violate federal law or policy," specifically 18 U.S.C. § 1001.[2] *Id.* ¶ 99. Plaintiff reported this "possible violation" to James Carlson, Shield AI's Chief Legal Officer and Ethics Officer, *id.* ¶ 100, and asked him "to take particular note that he was reporting this himself, in case the issue came up later," *id.* ¶ 74. Plaintiff was terminated four days after he made this report "on a flimsy pretext of 'performance.'" *Id.* ¶ 101. Plaintiff thus concludes that his "termination was partly based on his decision to make a good faith report based on reasonable belief that [Shield AI] had violated federal law." *Id.* ¶ 102.

Defendant argues that Plaintiff's "alleged disclosure" is not protected by the DCWPA because, (1) Plaintiff "did not have a reasonable belief that Shield AI had violated federal law"; (2) "any alleged violation of law did not relate to a DOD contract, as required"; (3) Plaintiff failed to allege that Shield AI was on notice of his disclosure; and (4) Plaintiff failed to allege that "his termination was caused by any protected disclosure." Mot. at 22–28. The Court discusses each argument in turn.

/ / /

/ / /

_____

[2] "Any person who knowingly and willfully makes a materially false statement to the federal government is subject to criminal liability under 18 U.S.C. § 1001(a)." *United States v. Horvath*, 492 F.3d 1075, 1076 (9th Cir. 2007).

25-CV-1798 JLS (MSB)

### A.    Reasonable Belief

At the motion to dismiss phase, a plaintiff "need only plead a 'reasonable belief' that her disclosures were protected, and that belief need not be correct." *Kappouta*, 60 F.4th at 1218 (citing *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1001 (9th Cir. 2009)). "However, the belief must be objectively reasonable." *Id.* In considering other federal whistleblower statutes, courts have interpreted the "reasonable belief" standard to involve both a subjective and objective component. *Erhart v. Bofi Holding, Inc.*, No. 15-CV-2287-BAS(NLS), 2016 WL 5369470, at *10 (S.D. Cal. Sept. 26, 2016) (citing *Rhinehimer v. U.S. Bancorp Invs., Inc.*, 787 F.3d 797, 811 (6th Cir. 2015)) (discussing Sarbanes-Oxley Whistleblower Retaliation under 18 U.S.C. § 1514A); *Kappouta*, 60 F.4th at 1218 (citing *Van Asdale*, 577 F.3d at 1001) (discussing how the reasonable belief requirement under the DCWPA includes both a subjective and objective component).

"The subjective component is satisfied if the employee actually believed that the conduct complained of constituted a violation of relevant law." *Erhart*, 2016 WL 5369470, at *10 (citing *Rhinehimer*, 787 F.3d at 811). The objective component "is evaluated based on the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee." *Id.*; *see also Kappouta v. Valiant Integrated Servs., LLC*, No. 20-CV-1501 TWR (BGS), 2021 WL 4806437, at *3 (S.D. Cal. Oct. 14, 2021), *aff'd*, 60 F.4th 1213 (9th Cir. 2023) (quoting *Coons v. Sec'y of U.S. Dep't of Treasury*, 383 F.3d 879, 890 (9th Cir. 2004)) ("In ascertaining reasonability [under a related whistleblower statute], a whistleblowing disclosure is protected if 'a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee [could] reasonably conclude that the actions . . . evidence [a violation of federal law].'"). This standard focuses on the plaintiff's belief at the time he reported the alleged misconduct. *Erhart*, 2016 WL 5369470, at *11 ("The standard [under the whistleblower retaliation section of the Sarbanes-Oxley Act] focuses on [the plaintiff's] belief at the time he reported [the defendant's] alleged misconduct—and whether a reasonable person *in his position*, not the Court's, would have believed that the conduct

constituted a violation of the relevant laws.").

Defendant argues that Plaintiff failed to allege a reasonable belief that backdating the SF 312 might violate federal law. Mot. at 22. Defendant highlights Plaintiff's allegation that "he did not see anything wrong with backdating the forms" in December of 2023 and that he delayed raising the issue until seven months later, in July 2024, while under investigation by Shield AI for violating company policies. *Id.* at 22 (quoting Compl. ¶ 38). Defendant contends that, while Plaintiff alleges the backdating may have violated 18 U.S.C. § 1001, "nowhere does it state that Plaintiff believed this at the time he made a report," especially considering Plaintiff's familiarity with SF 312 due to his military service. *Id.* Rather, Plaintiff only alleges that he "had some second thoughts about" the backdating of the forms and "disclosed those concerns because Shield AI raised issues related to his security clearance." *Id.* at 22–23 (citing Compl. ¶ 74).

Plaintiff argues that in July of 2024, he "knew that he had been instructed, repeatedly and as an 'important' matter, to sign [and backdate] forms that would be reviewed as part of an audit by the [DCSA]." Opp'n at 17 (quoting Compl. ¶¶ 35–37). Plaintiff contends that, at the time of his disclosure, he was not required to cite a specific statute. *Id.* Rather, it is sufficient to allege "that providing false information to the Government in connection with an audit might well violate a federal rule or statute." *Id.* Plaintiff contends that the DCWPA "requires only that the employee provide information that he believes is *evidence* of a violation." *Id.* at 18 (citing Compl. ¶ 74). The Court agrees.

Plaintiff plausibly alleges that, at the time of his disclosure to James Carlson, he had an objectively reasonable belief that backdating the SF 312 could violate federal law. First, as Defendant points out, Plaintiff is familiar with SF 312 through his time in the military and thus understands its purpose and importance. *See* Mot. at 24–25. Second, the Court is not persuaded that the delay in Plaintiff's reporting is enough to find his belief objectively unreasonable. Rather, the relevant inquiry is whether at the time of reporting, Plaintiff had an "objectively reasonable" belief that Shield AI violated federal law. *See Kappouta*, 60 F.4th at 1218 (citing *Van Asdale*, 577 F.3d at 1001). Third, the Court finds

25-CV-1798 JLS (MSB)

it objectively reasonable for a seasoned defense contracting employee to believe that being told to intentionally backdate a SF 312, during an audit by the DCSA, could violate federal law. *Cf. Kappouta*, 2021 WL 4806437, at *7 (finding that a "disinterested observer with knowledge of the after-hours shove could not reasonably conclude it evidenced a violation of law deserving whistleblower protection") (cleaned up). Finally, the Court finds that Plaintiff has sufficiently alleged that he subjectively believed this backdating could violate federal law. Plaintiff, concerned about his security clearance, reported the incident to James Carlson, the Chief Legal Officer and Ethics Officer for Shield AI, telling him to "take particular note that he was reporting this himself, in case the issue came up later." Compl. ¶¶ 73–74. Defendant does not point to any authority, and the Court is not aware of any, demonstrating that a reporting employee may not have any additional motivation for their report beyond reporting illegal activity—such as fear surrounding their security clearance. *See* Mot. at 22–24. At this stage, the Court finds that Plaintiff has plausibly alleged a reasonable belief that Shield AI violated federal law.

### B. Relate to a DOD Contract

"In the context of a defense contract, [the Ninth Circuit has concluded that] a violation of law is *related to* the contract if it is related to the purpose of the contract or affects the services provided by the defense contractor to the DoD." *Kappouta*, 60 F.4th at 1217. Thus, a disclosure is protected "if a disinterested observer with knowledge of the operative facts would reasonably conclude that the disclosure evidences a violation of law related to a defense contract in this manner." *Id.* (citing *Coons*, 383 F.3d at 890). Further, "relating to the contract necessarily implies some relationship to the terms or performance of that contract." *Id.* at 1217 (quoting *Todd Const., L.P. v. U.S.*, 656 F.3d 1306, 1312 (Fed. Cir. 2011)) (cleaned up).

Defendant argues that Plaintiff "alleges only that the backdating of documents was done so that Shield AI could 'continue to receive and work on DOD contracts.'" Mot. at 25 (quoting Compl. ¶ 98). Defendant asserts that it is fatal to Plaintiff's DCWPA claim that "he identifies no specific DOD contract, contract term, or contractual obligation to

25-CV-1798 JLS (MSB)

which his disclosure relates." *Id.* Defendant concludes it is improper for Plaintiff to "sidestep" this requirement "by asserting that his disclosure pertained to *all* of Shield AI's government contracts." Reply at 6.

Plaintiff argues that the "*only* possible inference from the facts" is that the "DCSA audit must be related to one or more DoD contracts, whether current or being competed for." Opp'n at 17. Plaintiff contends that this is because "[a] Defense contractor like [Shield AI] has no reason to be audited by the DCSA *except* to obtain and retain contracts with the Government." *Id.* Therefore, the backdating of the SF 312 relates to the contracts "insofar as it relates to [Shield AI's] ability to win, keep, and perform such contracts at all—by passing the DCSA's audits." *Id.* The Court again agrees with Plaintiff.

Plaintiff has sufficiently alleged that the potential violation, the backdating of the SF 312 for the DCSA audit, is "related to the purpose of the contract or affects the services provided by [Shield AI] to the DoD." *Kappouta*, 60 F.4th at 1217 (quoting *Coons*, 383 F.3d at 890). Under 28 C.F.R. § 2001.80(d)(2), an individual who has access to classified information must first execute a SF 312, "an agreement showing that he understands his obligations not to reveal classified information to unauthorized persons." Compl. ¶ 33; 28 C.F.R. § 2001.80(a) ("The use of the standard forms prescribed is mandatory for agencies of the executive branch that create or handle national security information. As appropriate, these agencies may mandate the use of these forms by their contractors, licensees, or grantees who are authorized access to national security information."). On December 1, 2023, Plaintiff was directed by Renee Connor, a Shield AI Facility Security Officer, to sign and backdate a new SF 312 "because of an upcoming audit by the [DCSA], a [g]overnment agency that supervises contractors to ensure they are complying with DOD security requirements." Compl. ¶¶ 35–38.

The Court finds that the alleged violation is "related to" Shield AI's contracts with the DOD. The audit was conducted by the DCSA to "ensure they are complying with DOD security requirements." *Id.* ¶ 37. The outcome of this audit directly "affects the services provided by [Shield AI] to the DoD" because if Shield AI were to fail the audit, they would

25-CV-1798 JLS (MSB)

risk being ineligible to continue their existing DOD contracts or apply for new ones. *Kappouta*, 60 F.4th at 1217. The backdating of the SF 312—a form ensuring compliance with DOD security obligations—to comply with a DCSA audit is related to Shield AI's contracts with the DOD. *See Todd Const.*, 656 F.3d at 1312 ("[R]elating to the contract" necessarily implies "some relationship to the terms or performance of [that] contract."). Further, Plaintiff's job duties directly involve his clearance, which requires the submission of a SF 312, making Plaintiff's job performance related to the alleged violation and DOD contracts. *Cf. Kappouta*, 60 F.4th at 1219 (finding the plaintiff's report of an after-hours personal dispute unrelated to her everyday job as a linguist pursuant to a defense contract and thus unrelated to a DOD contract).

The Court is not convinced by Defendant's argument that Plaintiff must identify the specific contract to which the alleged violation relates. *See* Mot. at 25. Defendant's reliance on *Penna* and *Mabie* is misplaced. For example, in *Penna v. North Clackamas School District*, the court found the DCWPA inapplicable to the plaintiff's argument surrounding the distribution of COVID-19 vaccines because the plaintiff failed to allege that there was any contract between DOD and the defendant, much less that the distribution of COVID-19 vaccines related to any defense contracts. No. 22-CV-01417-YY, 2023 WL 6003834, at *6–7 (D. Or. Aug. 11, 2023), *report and recommendation adopted as modified*, 2023 WL 6850268 (D. Or. Oct. 17, 2023). Here, Plaintiff alleges that Shield AI has extensive defense contracts and "is a Defense technology company that . . . develops artificial intelligence for manned and unmanned military aircraft." Compl. ¶¶ 11, 97 ("[Shield AI] is a contractor that performs services for the Department of Defense."). Further, the alleged violation at issue is directly related to Shield AI's relationship with the DOD and compliance with the DOD's security requirements. Plaintiff's allegations are hardly the "generalized claims" that Defendant characterizes them to be. *See* Mot. at 25.

Further, in *Mabie v. Abdalati*, the plaintiff, seeking protection of the federal whistleblower statute (41 U.S.C. § 4712), solely alleged that all his "work activities are related to government contracts." No. 21-CV-02890-MEH, 2022 WL 1810594, at *13 (D.

25-CV-1798 JLS (MSB)

Colo. June 2, 2022). The plaintiff's main allegations connecting his concerns to a defense contract were that the research center where he worked conducted research projects for, and provided data to, federal agencies, and that there was a "gross mismanagement that was putting climate data at risk of loss." *Id.* (cleaned up). The court found that this was merely "a tangential or indirect relationship between his employment (and the alleged adverse actions that [the defendant] may have taken against him) and federal contracts or contractors." *Id.* Here, Plaintiff's "services to [Shield AI] related primarily to Department of Defense contracts," and the alleged violation directly relates to Plaintiff's security clearance for working on these contracts. Compl. ¶ 97. The relationship between Plaintiff, the backdated SF 312, the DCSA audit, and Shield AI's role as a defense contractor consistently working with the DOD, is far more than the "tangential or indirect" relationship that was at issue in *Mabie*.

Therefore, Plaintiff sufficiently alleged that the backdating of the SF 312 is related to DOD contracts. *See United States ex rel. Cody v. ManTech Int'l, Corp.*, 746 F. App'x 166, 181 (4th Cir. 2018) (finding proper grounds for a DCWPA suit where an employee reported that a contractor was intentionally submitting bids for defense contracts with deflated estimated labor costs); *cf. Kappouta*, 60 F.4th at 1217–18 (finding reports of a shove by an intoxicated co-worker on an U.S. Embassy compound failed to create a sufficient nexus to a DOD contract because "the disclosures concerning the shoving incident were, at best, only tenuously related to the defense contract"); *Ficarra v. SourceAmerica*, No. 19-CV-01025, 2020 WL 1606396, at *4–6 (E.D. Va. Apr. 1, 2020) (holding that a disclosure relating only to non-governmental contracts failed to provide a sufficient nexus to a DOD contract because "[t]o conclude otherwise would sweep within the ambit of [the DCWPA] virtually every manufacturer . . . that sells products both to the federal government and to private entities, even though the alleged underreporting of profit [from non-governmental contracts] does not have any connection to any federal contract").

///

///

24

### C.   Notice

Under the DCWPA, an employee of a contractor cannot be "discharged, demoted, or otherwise discriminated against as a reprisal" for reporting a "violation of law, rule, or regulation related to a Department contract" to a "management official or other employee of the contractor . . . who has the responsibility to investigate, discover, or address misconduct."  10 U.S.C. § 4701(a)(1)–(2).

Defendant argues that James Carlson is not a proper "management official or other employee of the contractor" to raise the complaint to, as "[m]erely reporting an internal issue to a supervisor or another company representative does not constitute protected conduct."  Mot. at 23 (citing *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 423 (D.C. Cir. 2005)). The Court disagrees.  James Carlson is the Chief Legal Officer and Ethics Officer of Shield AI.  Compl. ¶ 12.  The Court is persuaded that the Chief Legal Officer and Ethics Officer of a company can constitute a "management official or other employee of the contractor . . . who has the responsibility to investigate, discover, or address misconduct."  10 U.S.C. § 4701(a)(1)–(2).  Defendant's arguments otherwise are unavailing.  *See Foosaner v. Crown Castle USA, Inc.*, No. 22-CV-521 (RDA/JFA), 2023 WL 5435605, at *4 (E.D. Va. Aug. 23, 2023) ("Although Defendant may conceivably be able to prove at summary judgment that the persons to whom Plaintiff spoke did not have a responsibility to investigate, Plaintiff has alleged sufficient facts for the Court to reasonably infer that the persons to whom he reported his concerns were 'responsible' within the meaning of the DCWPA.").

Defendant also argues that "the fact Plaintiff disclosed 'concerns' about the backdated forms to Shield AI was insufficient to put Shield AI on notice that he was alleging a violation of law."  Mot. at 23.  Defendant contends that Plaintiff failed to put Shield AI on "objective notice that [he] was engaging in protected whistleblowing activity," *id.* at 26 (quoting *Cody*, 207 F. Supp. 3d at 621–22), because he "merely conveyed a subjective belief that the backdating '*might* violate federal law or policy,'" *id.* (quoting Compl. ¶ 99).

Plaintiff argues that by making a "deliberate report" to Shield AI's Chief Legal Officer and Ethics Officer and by specifically asking that officer to "remember that he had made the report," he has sufficiently alleged that Shield AI was on notice of his report. Opp'n at 22 (citing Compl. ¶ 74). The Court agrees.

To determine whether a company has noticed that an employee engaged in protected activity under the DCWPA, courts consider "whether the employee has used language that, under the relevant circumstances and within the specific context in which the communications were made, puts an employer on reasonable notice that the employee is bringing to its attention conduct that qualifies as 'protected activity.'" *Lillie*, 2019 WL 3387732, at *20 (citing *Cody*, 207 F. Supp. 3d at 621–22).

The Court finds that Plaintiff has sufficiently alleged notice. Plaintiff scheduled a call with the Chief Legal Officer and Ethics Officer to discuss his "concerns" regarding the Counseling Documentation and its inaccurate language, his USERRA rights, Shield AI's failure to train him on the new security policy, and the backdating of the SF 312. Compl. ¶¶ 73–74. This is not merely grumbling about regulatory violations to a supervisor as Defendant contends. *See* Mot. at 23. Rather, this is a scheduled phone call with the head legal and ethics officer of Shield AI to discuss concerns regarding potential violations of federal law and policy, i.e., USERRA and intentionally backdating a government form. Under these circumstances, Shield AI reasonably should have been on notice that Plaintiff was bringing potential violations of federal law to its attention. *See Lillie*, 2019 WL 3387732, at *20 (finding no notice where the only report of misconduct was to a supervisor and the ethics department was not informed); *Cody*, 207 F. Supp. 3d at 617–18, 623–24 (finding no notice when the only reports of potential violations were concerns expressed over email to team members involved on the project, but finding notice where the employee reported to the "Senior Vice President of Compliance," the "Senior Compliance Officer," human resources, and the compliance department that the employee feared retaliation based on expressing concerns to their team members); *Turner v. BAE Sys., Inc.*, No. 25-CV-463, 2026 WL 963080, at *5 (D. Haw. Apr. 9, 2026) (finding sufficient notice where

25-CV-1798 JLS (MSB)

the plaintiff "reported that the on-site Security Manager had sold a company workstation" and "made comments about taking equipment home or selling items" (cleaned up)). Therefore, Plaintiff has sufficiently alleged notice.

### D.  Causation

Under the DCWPA, "a plaintiff must only establish that retaliation for a protected disclosure 'was a contributing factor' to any adverse personnel action taken against the plaintiff." *Cody*, 746 F. App'x at 178 (quoting 5 U.S.C. § 1221(e)(1)). "A contributing factor is any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision." *Feldman v. Law Enf't Assocs. Corp.*, 752 F.3d 339, 348 (4th Cir. 2014) (internal quotation marks and citation omitted). "Temporal proximity between the protected activity and the adverse action is a significant factor in considering a circumstantial showing of causation, the causal connection may be severed by the passage of a significant amount of time, or by some legitimate intervening event." *Cody*, 207 F. Supp. 3d at 624 (quoting *Feldman*, 752 F.3d at 348) (internal citations, quotation marks, and alterations omitted).

Defendant, while citing to summary judgment cases discussing causation under the USERRA, argues that the four-day period between the report and Plaintiff's termination does not raise an inference of causation because "temporal proximity alone—especially when accompanied only by vague speculation and when the adverse action was preceded by a period of progressive discipline that began before the protected activity—is insufficient to establish causation." Mot. at 27 (first citing *Burgener v. Union Pac. Corp.*, No. C 07-5160 JF (HRL), 2009 WL 1082356, at \*13 (N.D. Cal. Apr. 22, 2009); and then citing *Caines v. City of New York*, No. 13-CV-676 (VEC), 2015 WL 13021892, at \*5 (S.D.N.Y. July 8, 2015), *aff'd*, 649 F. App'x 74 (2d Cir. 2016)).

Plaintiff argues that there were no legitimate reasons for firing him because there were no issues with his performance leading up to his termination. Opp'n at 23. Plaintiff contends that his report of the backdated SF 312, assertion of his USERRA rights, and military service were all "contributing factors" to his termination; therefore, he has

25-CV-1798 JLS (MSB)

sufficiently demonstrated causation. *Id.* The Court agrees.

As discussed above, Plaintiff has sufficiently alleged that his termination based on "performance" may be pretextual due to his promotions, bonuses, and generally positive feedback throughout his time with Shield AI. *See* Compl. ¶¶ 17–19, 39–42, 65–68, 79. Plaintiff's meeting with James Carlson, discussing the backdated SF 312 and his USERRA rights, occurred four days before his termination. Opp'n at 23. This temporal proximity is a "significant factor" for circumstantial evidence of causation. *See Cody*, 207 F. Supp. 3d at 624 (quoting *Feldman*, 752 F.3d at 348). The temporal proximity between the report and his termination combined with a potentially pretextual reason for termination is sufficient at this stage to allege causation. *See id.* ("Under this 'broad and forgiving' standard, a plaintiff has 'a rather light burden of showing by a preponderance of the evidence that the [protected] activities tended to affect his termination in at least some way.'" (quoting *Feldman*, 752 F.3d at 348)); *Alden v. AECOM Tech. Corp.*, No. 18-CV-03258-SVK, 2019 WL 13066637, at *4 (N.D. Cal. June 14, 2019) (denying a motion to dismiss where there were two-and-a-half years between the alleged whistleblowing and the plaintiff's termination because the court could not conclude "as a matter of law that no reasonable person could link the two events," especially where there were negative comments regarding the plaintiff in between the two events); *Foosaner*, 2023 WL 5435605, at *5 (denying a motion to dismiss based on a temporal connection of eleven days between the report and the plaintiff's termination).

Based on the foregoing, Defendant's Motion is **DENIED** as to Plaintiff's DCWA claim.

### III.    California Labor Code § 1102.5

California Labor Code § 1102.5 prohibits an employer from retaliating against an employee "for disclosing information . . . to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct [a] violation or noncompliance . . . with a local, state, or federal rule or regulation." "To establish a prima facie case of retaliation under § 1102.5(b), a plaintiff must show: (1) she engaged in

protected activity, (2) she was thereafter subjected to adverse employment action by her employer, and (3) causation." *Smith v. Coupang, Inc.*, 772 F. Supp. 3d 1228, 1244 (W.D. Wash. 2025) (citing *Ferretti v. Pfizer Inc.*, 855 F. Supp. 2d 1017, 1025 (N.D. Cal. 2012)); *see also Soukup v. L. Offices of Herbert Hafif*, 39 Cal. 4th 260, 287–88 (2006) ("Labor Code section 1102.5 is a whistleblower statute, the purpose of which is to encourage workplace whistle-blowers to report unlawful acts without fearing retaliation." (cleaned up)).

Defendant argues that Plaintiff's § 1102.5 claim "fails for the same fundamental reasons as his DCWPA claim" because he failed to identify a federal rule or regulation that he reasonably believed Shield AI violated, any belief that Shield AI violated a federal rule or regulation was unreasonable, and Shield AI was not on notice of any such violation. Mot. at 28–29. Defendant further argues that Plaintiff's claim lacks a "meaningful connection" with California to apply California labor laws. *Id.* at 30–31.

Plaintiff argues that his § 1102.5 claim survives for the same reasons as his DCWPA claim—he sufficiently alleged that he reported Shield AI's decision to provide false information to the Government, he identified the federal statute at issue in his Complaint, and his belief was reasonable. Opp'n at 25. Plaintiff further argues that California labor law applies because Shield AI is headquartered in San Diego, California, and therefore, the decision to terminate Plaintiff "was made and effectuated in California." *Id.* at 26. However, as Plaintiff concedes in his Opposition, Plaintiff does not allege that the decision to terminate him came from Shield AI's headquarters in California. *Id.* at 27 n.11. The Court discusses each of Defendant's challenges in turn.

### A. Exterritoriality

"State statutes are presumed not to have extraterritorial effect." *Cotter v. Lyft, Inc.*, 60 F. Supp. 3d 1059, 1061 (2014) (citing *N. Alaska Salmon Co. v. Pillsbury*, 174 Cal. 1, 4 (1916)). "California presumes that its legislature does 'not intend a statute to be operative, with respect to occurrences outside the state, . . . unless such intention is clearly expressed or reasonably to be inferred from the language of the act or from its purpose, subject matter

25-CV-1798 JLS (MSB)

or history.'"  *Daramola v. Oracle Am., Inc.*, 92 F.4th 833, 843 (9th Cir. 2024) (quoting *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1207 (2011)) (cleaned up).  Courts considering the extraterritoriality of § 1102.5 have concluded that nothing in the code's language "indicates the California legislature's intent for the statute to apply extraterritorially." *Smith*, 772 F. Supp. 3d at 1244 (citing *Leibman v. Prupes*, No. 14-CV-9003-CAS (VBKx), 2015 WL 3823954, at *7 (C.D. Cal. June 18, 2015)); *see, e.g.*, *Lively v. Wayfarer Studios LLC*, 24-CV-10049, 2026 WL 905447, at *40 (S.D.N.Y. Apr. 2, 2026) ("Applying this presumption, courts have found that . . . California Labor Code Section 1102.5 [does] not apply to claims arising out of conduct occurring outside the state."); *Hill v. Gergun Transp., Inc.*, No. 24-CV-1751-CSK, 2024 WL 4203379, at *11 (E.D. Cal. Sept. 16, 2024) ("[O]ther California courts examining this statute have concluded that nothing in the language of § 1102.5 indicates the California legislature's intent for the statute to apply extraterritorially, and this Court concurs.") (citation omitted).

"Courts have identified several factors which are relevant to determine whether the California Labor Code is appropriately applied extraterritorially for an out-of-state plaintiff: (1) the employer's citizenship, (2) the employee's state of residence, and (3) whether/how much the employee worked in California." *Hill v. Workday, Inc.*, 773 F. Supp. 3d 779, 797 (N.D. Cal. 2025) (collecting cases).  Courts considering "California's retaliation-based causes of action" also focus on "whether the individual's work had a substantial connection to California through the (1) situs of employment and (2) material elements of the cause of action."[3]  *Smith*, 772 F. Supp. 3d at 1244 (citing *Sexton v. Spirit*

---

[3] The test for extraterritoriality under the California Labor Code is not explicitly framed "as a two-element 'situs' test."  *See Workday*, 773 F. Supp. 3d at 797 ("Unlike the FEHA analysis discussed above, the test for extraterritorial application of the California Labor Code is not explicitly framed as a two-element 'situs' test. Thus, as with many areas of the law, the Court examines the issue here based on application of analogous precedent . . . as guidance for the contours of the test for the extraterritorial application of the California Labor Code.").  However, many courts use the test in analyzing whether a plaintiff's claim has a "substantial connection to California" as is required "to succeed in bringing a California [whistleblower protection act] claim." *Smith*, 772 F. Supp. 3d at 1244; *see, e.g.*, *Gergun Transp.*, 2024 WL 4203379, at *11 (discussing the two-element situs test in the context of § 1102.5 extraterritoriality); *Sexton*, 2023 WL 1823487, at *3 (discussing the two-element situs test in the context of FEHA).

25-CV-1798 JLS (MSB)

*Airlines, Inc.*, No. 21-CV-898-TLN-AC, 2023 WL 1823487, at *3 (E.D. Cal. Feb. 8, 2023)). "To avoid an impermissible extraterritorial application of state law, a 'crucial element' of a plaintiff's claim must have occurred in California." *Id.* (quoting *Eng. v. Gen. Dynamics Mission Sys., Inc.*, 808 F. App'x 529, 530 (9th Cir. 2020)); *Lively*, 2026 WL 905447, at *42 ("[I]t is not enough for a plaintiff to simply point to some event or activity that occurred in California. There must instead be a 'substantial connection' between California and 'the core of the alleged wrongful conduct' going to 'the material elements of the cause of action.'" (quoting *Sexton*, 2023 WL 1823487, at *4)).

Here, Plaintiff is a resident of New York, and the underlying security violations took place at Shield AI's D.C. office in Crystal City, Virginia. Compl. ¶¶ 10, 43. "Situs of employment consists of the employee's 'principal place of work,' 'definite base of operations,' or the location where the employee's work holds a substantial connection to." *Sexton*, 2023 WL 1823487, at *3 (quoting *Elzeftawy v. Pernix Grp., Inc.*, 477 F. Supp. 3d 734, 777 (N.D. Ill. 2020)). Here, while unclear where Plaintiff's "principal place of work" is, the only allegations concerning California are that Shield AI is headquartered and has its principal place of business in San Diego, California. Compl. ¶¶ 9, 11, 103.

Courts analyzing extraterritoriality in the context of wrongful termination lawsuits emphasize "the location of where the termination decision was made as a crucial element of the claim because this decision gives rise to the liability of the conduct." *Sexton*, 2023 WL 1823487, at *4 (citations omitted). However, here, Plaintiff does not allege where the decision was made to terminate him. *See generally* Compl. Plaintiff does not include any allegations concerning California beyond stating that because Shield AI has its principal place of business in San Diego, California, it is "therefore subject to California labor law." *Id.* ¶ 103.

This allegation is insufficient to demonstrate that a "crucial element" of Plaintiff's claim occurred in California. *See, e.g.*, *Leibman*, 2015 WL 3823954, at *8 (denying motion to dismiss § 1102.5 claim because the decision to retaliate and terminate the plaintiff occurred in California); *Gergun Transp.*, 2024 WL 4203379, at *12 (granting motion to

25-CV-1798 JLS (MSB)

dismiss § 1102.5 claim where the plaintiff did not allege any facts suggesting that the defendant's decision to terminate the plaintiff was made in California or tied to California); *Eng. v. Gen. Dynamics Mission Sys., Inc.*, No. EDCV 18-908 JGB (SHKx), 2019 WL 2619658, at *8 (C.D. Cal. May 8, 2019), *aff'd*, 808 F. App'x 529 (9th Cir. 2020) (granting summary judgment for a § 1102.5 claim where "all employment decisions regarding Plaintiff were made in Georgia"); *Wilson v. Wavestream Corp.*, No. 24-CV-00061-MCS-BFM, 2024 WL 3914475, at *3 (C.D. Cal. May 13, 2024) (denying motion to dismiss § 1102.5 claim where the defendant's decision to terminate the plaintiff's employment "after he disclosed information of alleged wrongdoing" came from the defendant and the defendant's HR personnel located in California).  As Plaintiff concedes, he did not allege where the termination decision occurred.  Opp'n at 27 n.11.  Therefore, Defendant's Motion is **GRANTED**, and Plaintiff's claim under California Labor Code § 1102.5 is **DISMISSED WITH LEAVE TO AMEND**.

### B. Substantive Challenge

For the sake of judicial efficiency, the Court considers Defendant's substantive challenge to Plaintiff's § 1102.5 claim, Mot. at 28–29, and finds that Plaintiff adequately states a claim for the same reasons concerning Plaintiff's DCWPA claim.  *See supra* Section II.

"To establish a prima facie case of retaliation under § 1102.5(b), a plaintiff must show: (1) she engaged in protected activity, (2) she was thereafter subjected to adverse employment action by her employer, and (3) causation."  *Smith*, 772 F. Supp. 3d at 1244 (citing *Ferretti*, 855 F. Supp. 2d at 1025).  "Protected activity requires the disclosure of a state or federal violation, but a plaintiff is not required to prove an actual violation as long [as] he reported his reasonably based suspicions of the illegal activity."  *Lillie*, 2019 WL 3387732, at *21 (internal quotation marks and citation omitted).  Further, "[t]he causal link may be established by an inference derived from circumstantial evidence, such as the employer's knowledge that the [employee] engaged in protected activities and the proximity in time between the protected action and allegedly retaliatory employment

decision." *Id.* (citing *Morgan v. Regents of Univ. of Cal.*, 88 Cal. App. 4th 52, 69–70 (2000)). Under § 1102.5, a "plaintiff's protected activity need only be a contributing factor in defendant's adverse employment decision." *Id.*

The Court again concludes that Plaintiff reasonably believed that requiring him to intentionally backdate the SF 312 violated 18 U.S.C. § 1001(a). Plaintiff was not required to name the statute number at the time of reporting, as Defendant contends. *See Dowell v. Contra Costa Cnty.*, 928 F. Supp. 2d 1137, 1155 (N.D. Cal. 2013) ("[E]ven if Plaintiff did not allege the exact state law she believe Defendants violated, the language of the statute—requiring that Plaintiff disclose what she has *reasonable cause* to believe is a violation of a state or federal statute—shows that Plaintiff's allegations suffice in this regard."). Additionally, Plaintiff's report of intentionally backdating a SF 312 for a DCSA audit is hardly an "internal personnel matter" as Defendant attempts to argue. *See* Mot. at 29. Further, Plaintiff has sufficiently alleged a causal connection between his report and termination four days later, as his report "need only be a contributing factor" in Defendant's termination decision. *See Lillie*, 2019 WL 3387732, at *21. Therefore, while Plaintiff fails to satisfy the extraterritoriality requirement, Plaintiff has otherwise sufficiently pled a § 1102.5 whistleblower retaliation claim.

**IV.   Legitimate and Nondiscriminatory Reason Behind Plaintiff's Termination**

Defendant next argues that Plaintiff's claims must fail because there is an "obvious alternative explanation" for his termination—violation of Shield AI's security policy. Mot. at 31 (quoting *Eclectic Props. E. LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014)). Plaintiff, mirroring his arguments discussed above, argues there is no "obvious alternative explanation" for his termination because the grounds for his termination, "performance," were a pretext. Opp'n at 29. Plaintiff further argues that "obvious alternative explanation" is an affirmative defense that warrants dismissal only "if the defendant shows some obvious bar to securing relief on the face of the complaint." *Id.* at 29–31 (quoting *Ortega v. Santa Clara Cnty. Jail*, No. 19-17547, 2021 WL 5855066, at *1 (9th Cir. Dec. 8, 2021)). The Court agrees with Plaintiff.

First, as discussed above, Plaintiff has sufficiently stated a claim for intentional discrimination or retaliation under 38 U.S.C § 4311 (USERRA) and whistleblower retaliation under 10 U.S.C. § 4701 (DCWPA). *See supra* Sections I–II. Therefore, there is plainly no "obvious alternative explanation" for Plaintiff's termination at this stage. Second, an "obvious alternative explanation" is an affirmative defense of which Defendant bears the burden. *See, e.g.*, *Belaustegui*, 36 F.4th at 924 ("[Under USERRA,] [a]n employee 'first has the burden of showing, by a preponderance of the evidence, that his or her protected status was a substantial or motivating factor in the adverse employment action; the employer may then avoid liability only by showing, as an affirmative defense, that the employer would have taken the same action without regard to the employee's protected status.'" (quoting *Huhmann*, 874 F.3d at 1105)). Defendant has not identified an "obvious bar to securing relief on the face of the complaint" to justify dismissal at this stage. *Ortega*, 2021 WL 5855066, at \*1. Therefore, Defendant's Motion is **DENIED** on these grounds.

### CONCLUSION

For the reasons above, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion to Dismiss Plaintiff's Complaint ("Mot.," ECF No. 23). <u>Within twenty-one (21) days</u> of this Order, Plaintiff either (1) **SHALL FILE** an amended complaint, or (2) **SHALL INDICATE** to the Court that he will not do so. Any amended complaint must be complete in and of itself without reference to Plaintiff's original Complaint; claims not realleged in the amended complaint will be considered waived. *See* S.D. Cal. CivLR 15.1; *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 928 (9th Cir. 2012) (noting claims dismissed with leave to amend that are not realleged in an amended pleading may be "considered waived").

**IT IS SO ORDERED.**

Dated:  May 7, 2026

Hon. Janis L. Sammartino
United States District Judge

25-CV-1798 JLS (MSB)